E-FILED
Monday, 22 August, 2022 08:50:37 AM
Clerk, U.S. District Court, ILCD

THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS (PEORIA)

JAMES C. SNOW, (N50072) )
                      )
        Plaintiff,    )
                      )
    v.                )   Case No. Peoria IL.:95-10041-001
                      )
UNITED STATES OF AMERICA, and )
BRADLEY W. MURPHY, (retired)  )
U.S. Atty. and OTHERS TO BE   )       SCANNED AT STATEVILLE CC and E-mailed
IDENTIFIED,                   )       _8-22-22_ by _CK_  _21_ pages
                      )               date     initials   No.
        Defendant.    )

PLAINTIFF'S MOTION TO UNSEAL RELATED PLEADINGS
AND DOCUMENTS PREVIOUSLY FILED UNDER SEAL

Plaintiff JAMES C. SNOW (Pro-Se), and for the reasons set forth herein,
hereby moves this Court for an Order to unseal pleadings filed UNDER SEAL in
this Court. In support of said motion, Plaintiff alleges the following:

1.   The UNDER SEAL pleadings that Plaintiff Snow seeks to have unsealed
are as follows:

United States v. Edward M. Hammond, Case No. 1:95-CR-10041-mmm-1
a. Motion Rule 35 to reduce by USA as to Edward M. Hammond. Filed on
   8-6-2001 - (Entered: 8-7-2001)

b. Minutes: before Judge Michael M. Mihm. Rule 35 hearing set Fri.
   10-5-01 at 8:45a.m. (Entered 8-31-2001)

c. Minutes: before Judge Michael M. Mihm. AUSA Murphy/Atty Leuck with
   Deft. Hammond present by phone for Rule 35 motion hearing. Hearing
   held in part. Court reserves ruling on motion to reduce, pending
   additional to be obtained from State Dept. of Corrections.
   (Entered 10-5-2001)

d. Minutes: before Judge Michael M. Mihm, AUSA Murphy/Atty Leuck with
   Dft. Hammond present by phone and Rule 35 hearing held 8:45    11-
   2-2001. Statements by counsel. Court is granting motion to reduce.
   (Entered 11-06-2001)

All the above mentioned SEALED pleadings are from the criminal docket for
Case #1:95-CR-10041=mmm-1 Uûnited States v. Edward M. Hammond.

?.                          INTRODUCTION

2.    In 2001 Edward M. Hammond testified under oath against this Petitioner
at his trial for murder (Case Number 1999-CF-1016). Hammond testified he was
never given nor promised any consideration in return for his testimony.

3.    Since this Petitioner's conviction he has sought to prove his innocence
relentlessly. One avenue has been through the filing of over a hundred freedom
of information requests. Some of those requests have bore fruit that should
directly impact this Courts' ruling on this motion.

4.    <u>EXHIBIT #1</u> Is a two page letter from John F. Leuck (the attorney of
of record for Edward M. Hammond), and McLean County States Attorney Teena M.
Griffin.

The letter RE: Snow-Murder Trial-Testimony of Redacted. Petitioner would
ask this Court to take Notice of page #2 of Exhibit #1 that shows Edward
Hammond was copied on this correspondence between Leuck & Griffin.

The letter shows there was an agreement/understanding between the State and
Hammond that his cooperation would be considered by AUSA Bradley Murphy. Date
of the letter - July 10, 2001

5.    Exhibit #2 is a letter to AUSA Brad Murphy (Dated July 31, 2001), from
Teena M. Griffin. This letter is redacted in part; However, there is enough
information to conclude this letter to AUSA Murphy is in response to the
letter from Leuck to Griffin. (Exhibit #1) The letter clearly states it's
seeking consideration on the part of a Federal Defendant in return for their
testimony against this Petitioner. (NOTE: EDward M. Hammond was the only
Federal Defendant to testify against this Petitioner who was represented by
Attorney John Leuck, who also had AUSA Brad Murphy representing the State.

6.    Exhibit #3 is an affidavit from Edward M. Hammond. In it he admits
he was given a deal on his Federal Charges, and told to lie about it if asked
by Petitioner's defense attorney.

2.

Argument.

7.   It is well established law that a criminal Defendant has a right to
confront his/her accuser, and the State has a duty to disclose all information
that can be used to impeach a witness. (Supreme Court 412)

8.   The truth of Hammonds promised deal or consideration in return for his
testimony was withheld from this Plaintiff. In doing so his rights to due pro-
cess, and a fair trial was denied. See Supreme Court Case Brady v. Maryland.

9.   There is compelling authority for this Court to enter an Order
unsealing these previously sealed pleadings, especially since the underlying
conviction of Hammond occured over 20 years ago. The sentence he was serving,
has been served. There is no need for secrecy at this point.

10.   There is no authority that restrains the unsealing of the Hammond
UNDER SEAL pleadings. In fact, all law is to the contrary. Of course, the
general rule is that anything that is filed with the Court is Public.

> It is beyond dispute that most documents filed in court are presumptively
> open to the public; members of the media and the public may bring third-
> party challenges to protective orders that shield court records and court
> proceedings from public view. [] This right is derived from the common-law
> principle that courts are public institutions that operate openly--a
> principle codified at 28 U.S.C. 452-- and judicially imposed limitations
> on this right are subject to the First Amendment.
>
> ...
> [If] documents have been "used in [a court] proceeding, "FED. R. Civ. P.
> 5(d), and consequently the possibility exists that they could "influence
> or underpin the judicial decision" and they are therefore presumptively
> "open to public inspection unless they meet the definition of trade
> secret or other categories of bona fide long-term confidentiality." []

Bond v. Utreras, 585 F.3d 1061, 1073, 1075 (7th Cir. 2009) (internal cita-
tions omitted).

Just as in the sentencing-related filings sought here - there is rarely
any basis for the sealing of Rule 35 proceedings. The Ninth Circuit
appropriately summarized the binding U.S. Supreme Court's position on
this issue. See, CBS, Inc. v. United States Dist. Court for Cent. Dist. 765
F.2d 823, 825-826 (9th Cir. 1985):

[I]n Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L. Ed. 2d 629 (1984), the Supreme Court, while not approving closure on the facts before it, approached the case from the standpoint that, at least potentially, the privacy rights of prospective jurors could be weighed in the balance against the interests of the press and the public in open proceedings.

The interest which overrides the presumption of open procedures must be specified with particularity, and there must be findings that the closure remedy is narrowly confined to protect that interest. The rule stated in Press-Enterprise is controlling here:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. 104 S. Ct. at 824.

The issue before us here concerns a proceeding under Rule 35, and nothing in the Rule's language, history, or judicial interpretation suggest that documents filed in support of motions for reduction of sentence should be treated in the same manner as presentence reports. In the absence of explicit legislative intent to the contrary, the general presumption of openness will prevail. See Press-Enterprise, 104 S.Ct. at 824. Motions to reduce sentence under Rule 35 are based on documents of a different nature than presentence reports. Pleadings under Rule 35 are filed by persons who have had their guilt adjudicated and sentence imposed in a public proceeding. A motion under Rule 35 seeks to modify the punishment deemed by the district court to be appropriate for the offense, and should likewise be public.

The government and the trial court here went so far as to assert that the government's interests would be threatened if even its position of support or opposition to the motion were made known. That idea is as remarkable as it is meritless. The penal structure is the least visible, least understood, least effective part of the justice system; and each such failure is consequent from the others. Public examination, study, and comment is essential if the corrections process is to improve. Those objectives are disserved if the government conceals its position on so critical a matter as the modification of a felony sentence in a celebrated case.

In the matter presented here, the interests asserted by the defendant and the government do not override the presumption of openness that is at the foundation of our judicial system. The petition for writ of mandamus is granted. The district court is directed to.............unseal the defendant's motion to reduce sentence and the government's response.

765 F.2d at 825-826 (emphasis added); See, also, United States v. Cicale, 2018 US. Dist. LEXIS 5325, *10-*11 (2018) (ED NY):

The Second Circuit has held that the First Amendment presumptively applies
to sentencing proceedings, see United States v. Alcantara, 396 F.3d 189,
196-98 (2d Cir. 2005), and it has described as "persuasive" the holdings
of other courts that the same right of access attaches to documents filed
in connection with sentencing proceedings, id. at 197 (citing CBS, Inc v.
U.S. Dist. Ct. for the Cent. Dist. of Cal., 765 F.2d 823, 826 (9th Cir.
1985) (Kennedy, J.); United States v. Santarelli, 729 F.2d 1388, 1390
(11th Cir. 1984)); cf. United States v. Gerena, 869 F.2d 82, 85 (2d Cir.
1989) (stating that the First Amendment qualified public right of access
extends to materials filed in connection with "post-trial motions").
Several other courts have held that the First Amendment right of access
extends to motions relating to the calculation of a criminal sentence.
See CBS, 765 F.2d at 824-26 (Rule 35 motion and related pleadings);
United States v. Raybould, 130 F. Supp. 2d 829, 833 (N.D. Tex. 2000)
(Section 5K1.1 motion downward departure); United States v. Morales, No.
14-CR-3118, 2015 U.S. Dist. LEXIS 65564, 2015 WL 2406099, at *1-2(S.D. Cal.
May 19, 2015)(same); United States v. Fretz, No. 7:02-CR-67-1-F, 2012 U.S.
Dist. LEXIS 66014, 2012 WL 1655412, at *3 (E.D.N.C. May 10, 2012)(motion
for downward departure, Rule 35 motion, and motion to amend sentence);
United States v. Morgan, No. 5:06-CR-00164-02, 2008 U.S. Dist. LEXIS 34949,
2008 WL 1913395, at *3(S.D. W. Va. Apr. 28, 2008)(Rule 35 motion and related
documents); cf. United States v. Doe, 870 F.3d 991, 998 (9th Cir. 2017)
(assuming, without deciding, that First Amendment right of public access
attaches to documents filed in connection with a Section 5K1.1 motion).
The court sees no meaningful distinction between these cases and the
motion at bar: Whatever public interests are served by granting the
public access to the documents used by a court to determine a sentence
would also seem to be served by granting the public access to documents
relied on by a court to determine whether that sentence should be modified.

Cicale, supra, 2018 US. Dist. LEXIS 5325, *10-*11(emphasis added).

The Fourth Circuit applies the same reasoning. See United States v. Morgan,
2008 U.S. Dist. LEXIS 34949(SD West Virginia):

When the First Amendment provides a right of access, a district court may
restrict access 'only on the basis of a compelling governmental interest,
and only if the denial is narrowly tailored to serve that interest.'"Va.
Dep't of State Police, 386 F.3d at 575(quoting Stone, 855 F.2d at 180)
(emphasis added). "The burden to overcome a First Amendment right of access
rests on the party seeking to restrict access, and that party must present
specific reasons in support of its position." Id.(citing Press-Enter. Co.
v. Superior Court(Press Enter.II), 478 U.S. 1, 15, 106 S.Ct. 2735, 92 L.Ed.
2d 1(1986)("The First Amendment right of access cannot be overcome by [a]
conclusory assertion[.]")).

The Fourth Circuit has held that "the First Amendment right of access
applies to documents filed in connection with plea hearings and sentencing
hearings in criminal cases, as well as to the hearings themselves." In re

Wash. Post Co., 807 F.2d at 391. Naturally, this includes testimony given during a sentencing hearing. Id. at 389, 391; United States v. Santarelli, 729 F.2d 1388, 1390(11th Cir. 1984)("[T]he public has a First Amendment right to see and hear that which is admitted into evidence in a public sentencing hearing."). In addition, other courts have held that a motion to reduce sentence pursuant to Rule 35 is analyzed under the more stringent standard of the First Amendment. See, e.g., United States v. Raybould, 130 F. Supp. 2d 829, 833(N.D. Tex. 2000); see also CBS, Inc. v. U.S. Dist. Court for the Cent. Dist. of Cal., 765 F.2d 823, 826(9th Cir. 1985). Accordingly, all of the materials at issue in this case are analyzed under the First Amendment. See Va. Dep't of State Police, 386 F.3d at 576 ("district court[s] first 'must determine the source of the right of access with respect to each document[]'").

As the court stated in Raybould, [United States v. Raybould, 130 F. Supp. 2d 829, 831 (N.D. Tex. 2000]

> Few things would cause the public to be more suspicious of our system of criminal justice than to have secret proceedings that lead to special sentencing treatment for select criminal defendants. The public has a vital interest in knowing the details of deals made between the government and criminal defendants that accomplish, or have the potential to bring about, lower punishment than otherwise contemplated by law. If those aspects of a criminal case were to be kept secret, the public and the press would have reason to question the trustworthiness of the judicial process and whether judicial and prosecutorial abuses might be occurring.
> 130 F. Supp. 2d at 833.

As mentioned above, to overcome the presumption of openness in a criminal case, a compelling governmental interest must be shown. Va. Dep't of State Police, 386 F.3d at 575. "Compelling interests may include the defendant's right to a fair trial, privacy interests of the defendant, victims or other persons, the integrity of significant [government] activities entitled to confidentiality, such as ongoing undercover investigations or detection devices, and danger to persons or property." United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995)(internal quotation marks and citations omitted);

11.    There is no compelling reason the government can advance for objecting to the unsealing of the  Hammond         UNDER SEAL pleadings. The pleadings were filed years ago. There is no right of    Hammond         to a fair trial that competes with the presumption of openness. There are no ongoing under-cover investigations or detection devices involved in these cases where guilt had been adjudicated over 30 years ago. Nor, can it be imagined that there exists any present danger to persons or property that would compete with

the presumption of openness.

12.   This Court can appropriately conclude that the ONLY reason the government might have for the opposing of the unsealing of the UNDER SEAL pleadings in the Hammond case is the fact that the government just does not want Plaintiff Snow to know exactly what happened in that case, thus depriving him of any benefit he may receive from an argument that his constitutional rights to due process and a fair trial have been denied. Putting aside the cruelty of such an argument, it fails any rational, much less constitutional, test for maintaining the sealing of the Edward M. Hammond pleadings.

13.   It's hard to imagine a case that better demonstrates the need for openness in a criminal case. The first assistant States Attorney for McClean County, Teena M. Griffin coluded with an A.U.S.A Bradley Murphy to hide a deal she had promised to a jailhouse snitch witness. If it hadn't of been for the relentless pursuit of the truth on the part of this Petitioner, he may have never found the exhibits attached to this motion.

14.   This Court can and should take judicial notice of the fact that Bradley Murphy was censured by the Illinois Supreme Court in May of 2007. He was censured for failing to disclose information affecting the credibility of a witness. The ARDC investigation concluded Murphy violated Rule 1.2(f)(3) of the Illinois Rules of Professional Conduct as well as Rule 3.3(a)(13), Rule 3.8(c), Rule 8.4(a)(5), and Supreme Court Rule 770.

Please take notice of ARDC No. 1992775 Attorney-Respondent, Commission No. 06 sh 74 (for complete details)

Clearly Murphy has a history of violating the rules of Brady v. Maryland. Interestingly the case Murphy was censured for came out of McClean County States Attorney's Office that prosecuted this Plaintiff.

Surely this Court would have never agreed to seal these records had the Court known at the time what was really going on behind the scenes between Bradley Murphy and then First Assistant States Attorney Teena Griffin.

## Conclusion

This Petitioner asks this Court to Order the unsealing of the Under SEAL pleadings referenced above in the Edward M. Hammond case. These pleadings are not only covered by the First Amendment, but also by the Constitutional holdings in the Supreme Court case Brady v. Maryland.

This Petitioner also asks this Court to recognize he is Pro-Se in this matter, and an inmate of the Illinois Department of Corrections, and seeks this Court to make any accomodations needed for him to be able to be heard by this Court.

Date:_____

Respectfully Submitted,

James Snow   N-50072

James Snow
Reg. No. N-50072
Stateville Correctional Center
C/O: P.O. Box 112
Joliet, Illinois 60434-0112

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on _____, I caused to be electronically filed the foregoing to the Clerk of the Court by using _____ system which will send notification of such filing to the following:

Bradley W. Murphy
U.S. Attorney
One Technology Plaza
Suite 400
211 Fulton Street
Peoria, Illinois 61602

**EXHIBIT F**

JOHN F. LEUCK
ATTORNEY AT LAW
234 NE MADISON AVE.-STE. 207
PEORIA, ILLINOIS 61602-1245
(309) 999-3600
FAX (309) 637-2432

RECEIVED

JUL 16 2001

STATE ATTORNEY'S OFFICE
McLEAN COUNTY

July 10, 2001

TEENA M. GRIFFIN
104 West Front Street-Rm. 621
Bloomington, IL 61701

RE: SNOW - MURDER TRIAL - Testimony of ██████████

Dear Ms. Griffin:

I am writing you on behalf of ████████████ 2600
W. Brinton Ave., Dixon, Illinois, 61021.

I previously represented him in a Federal Matter, at which
time he received a rather lengthy sentence, which Federal
Sentence is to commence when he completes his State sentence.
BRADLEY MURPHY, Assistant United States Attorney, has discussed
this matter with me and advised he would consider filing a motion
for a sentence reduction, if he provided sufficient information
that was beneficial in the above referenced trial. He originally
talked with the McLean County State's Attorney, and advised him
of his willingness to provide information and cooperate, if
consideration would be given to him by AUSA MURPHY for his
cooperation. He knows and is aware any sentence reduction
request is solely at the discretion of AUSA MURPHY, in
consideration for the nature and results of his information and
testimony.

I previously left a message for you, which you returned and
stated after SNOW was sentenced you would be willing to discuss
this matter with AUSA MURPHY. I understand he received a lengthy
sentence, despite the efforts of my good friend, Attorney Frank
Picl.

Any consideration that could be given ████████ through
your cooperation with AUSA MURPHY would be greatly appreciated.

I was the opposing Attorney in the Curtis Britton case,
heard in McLean county in early 1995. (94-CF-1003)

Exhibit 4
Page 2

If you have any questions please call me at (309) 999-3600.

Sincerely,

7(1)(b) Private Information

JOHN F. LEUCK

cc: AUSA BRADLEY MURPHY
    211 Fulton, Suite 400
    Peoria, Illinois 61602
    Phone: 309-671-7050

cc: EDWARD HAMMOND N71367
    2600 W. Brinton Ave.
    Dixon, IL 61021

*Exhibit #2*

# CHARLES G. REYNARD

**McLean County State's Attorney**

Teena M. Griffin
First Assistant State's Attorney

Law and Justice Center, Room 605
104 West Front Street, P O Box 2400
Bloomington, Illinois 61701-2400
Telephone: (309) 888 - 5400
FAX number: (309) 888 - 5429

July 31, 2001



AUSA Brad Murphy
211 Fulton Street, Suite400
Peoria, IL 61602

RE ███████ Testimony

Dear Brad:

I am writing to advise your office of the cooperation of a federal defendant, ███████, in a murder trial recently concluded her in McLean County. ███████ cooperated with the Bloomington Police Department and our office in answering questions and providing information that he had regarding the involvement of our defendant, James C. Snow. ███████ was actually called as a witness by us in the case of People v. James C. Snow, 99 CF 1016. ███████ provided compelling testimony against Mr. Snow who was convicted of First Degree Murder in the case.

If you have any questions about ███████ assistance to us or need any further information from me, please let me know.

Very truly yours,

Teena M. Griffin
First Assistant State's Attorney

CC John Leuck

Exhibit #3

# Affidavit of Ed Hammond

I, Edward Hammond, under oath and penalty of perjury, subscribe and swear as follows:

1. My name is Edward Maurice Hammond. I am 54 years old. My birthday is Friday. I am currently a resident at Avon Park Correctional Institution.

2. Prior to my testimony in Jamie Snow's criminal case for murder, I last saw him one time in Centralia Correctional Center. After my testimony, I may have seen him from a distance at Stateville, though I am not sure it was him. Since my testimony I have not talked to Jamie or received any letters from him.

3. I would describe Jamie and I as acquaintances. We have run in the same circles since we were kids. Bloomington is not that big of a town and we knew some of the same people. We were not friends but we had friends in common. Jamie is not someone I wanted to hang out with. We were never close.

4. I was in jail when Bill Little was killed. I ran a pod at the jail and everyone in the jail was talking about the case. From the very

C.Milly.

beginning I heard a lot of rumors that Jamie was involved. It was always people saying "I heard..." or people who were Northrider wannabes who thought it was impressive to know things who were saying they knew Jamie was involved. The only person who ever told me that they had direct knowledge of what happened was Troy Moews. and Jeff Jackson. E.M.H. I never found Troy to be a trustworthy person based on my personal dealings with him.

5.   I was in Centralia Correctional Center in 1995. I don't remember the exact date but on one occasion I saw Jamie Snow when I walked int the medical area. Inmates are not really supposed to talk in that area. We were in the medical area together for about five minutes before he left. We said words to the effect of "what's up" to each other and I learned he was in the opposite side and not on my yard. We did not talk about Jamie's case or about Bill Little. Never in my life have I talked to Jamie Snow about his case.

6.. When I was in Centralia I never slid to one yard from the other. I was not trying to get in trouble at that time. I was still married and really cared about my family visits. I wanted to be as close to my family as possible and was not trying to do anything to mess that up.

E.M.H.

7.    While I was at Centralia I only saw Jamie the one time in medical. We did not have chow together. We never saw each on the yard, in the laundry, or anywhere else other than the one time for medical.

8.    I understand that what I am saying in this affidavit is not what I said when I testified at Jamie Snow's trial. What I said at trial about Jamie is not true. I am giving this affidavit because I am trying to right a wrong.

9.    I remember somebody from BPD coming to see me at Illinois River concerning Jamie Snow. I have been told Detectives Crowe and Barker came to see me there and I have no reason to think that is wrong but I don't remember who it was. This must have been 1996 because I wasn't at Illinois River very long. I don't remember details but I remember them asking me something to the effect of if I was willing to help.

10.    I don't remember what I told these detectives but the people ~~from~~ <sup>FUNNEL</sup> taking this affidavit read to me a statement saying that I told these detectives that Jamie told me he did it. I don't remember saying that but it sounds like something I would

E. Wiff

say to benefit myself. I think the indication I got was that Jamie was about to be arrested. I would have wanted to get on the gravy train. If there was something I could do to help myself I would have done it.

11.   I think at the time these detectives came to see me I had recently pled guilty in a federal bank robbery case. I hadn't been sentenced but knew I was facing a ton of time. I thought it was over with and that case would be more time than I could do. I was worried I might lose my family and my daughter. I would have done anything to help ~~upon~~ myself at that point. If I thought cooperating against Jamie would help me that's something I would have done.

12.   Sometime after those detectives came to see me I got 125 months of federal time. I had to finish my state court time before going to federal prison. I filed an appeal but when that was denied I thought it was over and I wouldn't get out until 2006. I was worried about my family.

13.   I got to Dixon in 1997 and was there until I went to federal custody in 2002. I was housed at STC until 2000 at least. I remember Barkes and Katz coming to see me, maybe twice.

EMtH

14. I have been told Barkes and Katz came to see me in 1999. I have no reason to think that date is wrong. The first time they came to see me they told me they were there for the Jamie Snow matter. I had bad blood with Barkes from before because he'd told my wife she could do better than me and I was not worth it. I asked Barkes why I should help him and mentioned my wife. Barkes said this wasn't about that. He said if I helped them they could help me. I told them my state time was short. Either the first or second visit (I think there might have been two visits) they told me it was possible they could help with my federal time, that they would help talk to the state's Attorney to see what could be done.

15. These detectives knew I was at Centralia with Jamie. They asked me if I could go from one yard to another to see people at Centralia. I told them I had seen Jamie at medical. They asked me if I had ever seen him on the yard and I told them we were in different parts of the prison. They asked me if I could go from one yard to another to see people at Centralia. I understood what they wanted from me and I told them that I'd seen Jamie on the yard, that he'd told a bunch of people

E.M.H

he did it and I told him to shut up about it because he was bragging about it. This was untrue. I saw Jamie only once at Centralia and never talked about his case with him. I lied to help myself. I had never rolled on anyone before and I think that made me more believable. I remember giving the detectives more detail and trying to make myself more important by saying I was in Jamie's inner circle. None of that was true. I was just trying to help myself.

16. Sometime after the detectives came to see me Charles Reynard and Teena Griffin came to see me. Griffin asked more questions but Reynard was there and told me something like if I did my part they would keep their word. He told me his word carried a lot of weight. He told me he would tell the feds that I had helped them and that could help me get a time cut in my federal case. I think before Reynard and Griffin came I talked to my lawyer and told him they were asking me about a murder. My lawyer wasn't super enthused then but after Reynard and Griffin came I gave them my lawyer's contact information and after I talked to my lawyer again he told me he had talked to Brad Murphy the AUSA and that Murphy was open to a Rule 35 motion to reduce my sentence. At this point I was charged up and willing to say anything I needed to say.

S. Muff

I thought they were going to convict him anyway and I should help myself. It's like an armored car broke open on the street and everyone was picking up the money and I wanted to pick up the money too. I thought they had a great case and I never stopped to think why if they had such a great case they were talking to me. One of the four visitors told me they had already talked to Troy Moews, Jeff Jackson, Ed Palumbo, Junior Warden, and dropped names they thought I would know to suggest to me everyone was cooperating.

17. Nobody ever asked me about anyone but Jamie Snow. They mentioned Jamie, Stretch, and Mike Connelly as being people involved. They never mentioned Susan Claycomb. After they reassured me about the deal I did everything I could to be more help than they thought I could be. All that was out there from my perspective was that they got the guy who did it so I could help my family.

18. Later I was writted into the McClean County Jail for trial. I stayed in the booking area in an unlocked cell. I saw everyone who came in. I was able to connect up with women who were coming into the jail and was able to have sexual relations with ~~some of them in~~ a woman, Binny, in the bathroom. I got some telephone numbers and talked to some other women.

Einhill

⑦

19. I had it made the entire time I was in the jail. I got extra trays and didn't get locked up. I felt like I had it made because they needed me for trial. I got extra benefits while there.

20. Before I testified I talked to Teena Griffin at the court chute. I talked to her at the chute twice, once after I got to the jail and once the day I testified. The first time she explained how the trial was going to go and when I would be testifying, and I told her it was great at the jail. The day I testified Griffin told me where in the courtroom Jamie would be (to the left) and not to be surprised because his hair was slicked back and dark. The first time she saw me in the chute she explained to me that they would ask me if I got any state/federal deals and that I could say no because I didn't get a state deal. She told me I could say my state time was already served almost and that I had already lost everything because I got divorced. I would have lied anyway about any deals— I didn't want to do anything to jeopardize my deal.

21. I testified. What I testified about Jamie confessing to me was a complete lie. Everything I learned about Jamie's case was pure hearsay. I did what I did to help myself.

E. Mills

22.   After I got back to prison I talked to my lawyer and he said he would contact Brad Murphy. My memory is someone told me the Rule 35 couldn't be done until after Jamie's sentencing.

23.   The wait was very stressful but eventually I did get a Rule 35 motion granted. My federal time was cut from 125 months to 76 months. I was released from federal custody in November 2003.

24.   I have no direct knowledge about who killed Bill Little. Everything I testified to about what Jamie told me was a lie. Those details were either fed to me or fabricated myself.

25.   I am willing to take a polygraph test about everything in this affidavit. I believe I would pass. I have tried my best to tell the truth about what I recollect. I was not promised anything or threatened by anyone to do this. This is completely voluntary. I am signing this because I am trying to be a better person. It might be to little, too late, but I want to tell the truth.

26.   No attorney or investigator for Jamie Snow ever came to talk to me before my testimony. If they had I might have talked to them out of curiosity but I don't think I would have

E.M.W.

admitted the truth b them.

27.   If someone at trial had asked me to describe
      the south yard at Centralia I couldn't have done
      it because I didn't know that yard- I had never
      been there.

                                    Edward Maurice Hammond

State of Florida
County of Polk

Sworn to (or affirmed) and subscribed before me this
9th day of July, 2019, by Edward M Hammond

Personally known ____ or produced identification

Type of Identification Produced inmate ID Badge



Tiffany Porter
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG031486
Expires 9/19/2020

Tiffany Porter
Printed name of Notary
Tiffy Porter
Notary Signature

Notary Seal

My commission expires:
   9/19/2020